THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL PARK and BRANDY LEE   :
PARK, Individually and as Legal   :
Guardians of Minor Children, ERIE   :
PARK, JOSHUA MICHAEL PARK,   :
ELIZABETH MAE PARK, and   :
DESIREE MARIE TARANTINO   :
   :
       Plaintiffs   :
   v.   :   **3:09-cv-2177**
   :   **(JUDGE MARIANI)**
GARY VEASIE, Chief of Police of the   :
Borough of Weatherly, Individually,   :
OFFICER MICHAEL BOGART,   :
Individually, OFFICER BRIAN   :
MARKOVCHIK, Individually, and the   :
BOROUGH OF WEATHERLY, a   :
Municipal Entity Within the State of   :
Pennsylvania   :
   :
       Defendants   :

## MEMORANDUM OPINION

The present matter was initiated by Plaintiffs Michael Park ("Michael"), Brandy Lee

Park ("Brandy"), Erie Park, Joshua Michael Park ("Joshua"), Elizabeth Mae Park, and

Desiree Marie Tarantino (together, Plaintiffs"), in the Court of Common Pleas of Carbon

County, Pennsylvania, alleging that Defendants Gary Veasie ("Veasie"), Michael Bogart

("Bogart"), Brian Markovchik ("Markovchik"), and the Borough of Weatherly

("Weatherly")(together, "Defendants"), violated their civil rights in connection with the

execution of a search warrant at Plaintiffs' residence.  Plaintiffs filed this action pursuant to

42 U.S.C. §1983, and include several pendant state law causes of action. Defendants removed the matter to this Court asserting that jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1343, and that the matter was removable under 28 U.S.C. § 1441 (ECF Dkt. 1). Plaintiffs filed an Amended Complaint on December 3, 2009 (ECF Dkt. 4). On December 22, 2009, Defendants filed a Motion to Dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a cause of action upon which relief can be granted (ECF Dkt. 7). On May 3, 2010, this matter was reassigned to Judge Sylvia H. Rambo, following the elevation of Judge Thomas I. Vanaskie to the United States Court of Appeals.

On June 9, 2010, Judge Rambo issued an opinion and order denying in part and granting in part Defendants' Motion to Dismiss, which eliminated all claims except for: (1) Fourth Amendment claims against individual Defendants Veasie, Bogart, and Markovchik, and (2) all state law claims. Judge Rambo's Order also granted leave for Plaintiffs to file a Second Amended Complaint to: (1) provide a proper foundation to assert Fourth Amendment claims against Weatherly, and (2) amend their First Amendment retaliation claim against Defendant Veasie. Judge Rambo's Order prohibits the filing of any further amendments.

On June 22, 2010, Plaintiffs filed their Second Amended Complaint (ECF Dkt. 26). In accordance with Judge Rambo's Order, Plaintiffs reasserted all of their Fourth Amendment claims against the individual Defendants, a First Amendment claim against

Veasie, and Fourth Amendment claims against Weatherly. Plaintiffs also reasserted their

state law claims for: (1) intentional infliction of emotional distress; (2) false imprisonment;

and (3) false light invasion of privacy.

Plaintiffs filed a Motion for Partial Summary Judgment (ECF Dkt. 38) on January 21,

2011. Defendants then filed a Motion for Summary Judgment (ECF Dkt. 48) on March 15,

2011. Both motions are now ripe for adjudication.

## BACKGROUND

While some of the factual predicates underlying this matter remain a matter of

dispute, many of the proofs asserted by both of the parties are in substantial accord. On

September 18, 2008, Defendant Veasie was summoned to the Weatherly Elementary

School for the purpose of investigating the origin of suspected drug paraphernalia found in a

second grade classroom. (See Pls.' Amended Statement of Mat. Facts at 3, ECF Dkt. 78;

Defs.' Statement of Mat. Facts at 13, ECF Dkt. 79.) After a teacher found a device used for

smoking marijuana in the possession of seven year old Joshua Park ("Joshua"), the teacher

promptly informed the school's principal, who in turn, sought assistance from the school

guidance counselor. (See Melani Schaeffer Aff. at ¶ 4, ECF Dkt. 51.) The device, or bowl,

was confiscated by the principal and placed in a plastic bag. (See Sandra B. Slavick Aff. at

¶ 2, ECF Dkt. 51.) Following further consultation with the school's superintendent, and in

accordance with the procedures set forth in a Memorandum of Understanding ("MOU")

between the Weatherly School District and the Weatherly Police Department, the principal

reported the incident to the police. (*See* Defs.' Statement of Mat. Facts at ¶ 11; *see also* Memorandum of Agreement, ECF Dkt. 43-10.)

Defendant Veasie, after being called to the elementary school, contacted the Carbon County District Attorney's Office ("District Attorney") for advice (1) as to whether he could interview the student, and if so, (2) the proper protocol for such a meeting. (*See* Defs.' Statement of Mat. Facts at ¶¶ 13-14.) Veasie spoke with Detective Timothy Nothstein at the District Attorney's Office, and was advised that since the parents were the focus of the investigation, it would be proper for Veasie to interview the minor without notifying the parents so long as a school official was present. (*See* Defs.' Statement of Mat. Facts at ¶14; Timothy Nothstein Aff. at ¶¶ 7-8, ECF Dkt. 51.)

When Veasie arrived at the school, he interviewed Joshua in the presence of Principal Sandra Slavick ("Slavick"). (*See* Slavick Aff. at ¶ 10.) Joshua was asked to recount what he had earlier told Principal Slavick about the suspected contraband. (*See* Slavick Aff. at ¶ 10.) Joshua admitted that he brought the bowl to school, that it belonged to his parents, that his parents smoke from bowls, and that there were other bowls in his home. (*See* Slavick Aff. at ¶¶ 11-12.)

Veasie then contacted Jeff Aster ("Aster"), an agent with the Pennsylvania Attorney General's Office, and requested approval for a drug task force operation. (*See* Investigative Report of Pennsylvania Office of the Attorney General, Rpt. No. BN-1012308T, ECF Dkt. 51.) Veasie telephonically briefed Aster on multiple occasions throughout the day, and the

matter was designated as a task force case. (See id.) Aster then advised Veasie on the preparation of a search warrant, and told him to contact the on-call District Attorney and the on-call District Judge. (See id.) Veasie then contacted Assistant District Attorney Joseph Matika ("Matika") for prosecutorial approval of the proposed search warrant. (See Joseph Matika Aff. at ¶¶ 5-6.) The facts set forth in the Affidavit of Probable Cause ("Affidavit") were found by District Justice Homanko to constitute probable cause and a warrant was issued to search for drugs and drug paraphernalia at Plaintiffs' residence. (See Search Warrant, ECF Dkt. 51-1.) Specifically, the warrant identified the object of the search as follows: "Marijuana, Drug Paraphernalia, Glass bowls used for smoking marijuana and or illegal substances or paraphernalia." (See id.) Veasie also contacted Carbon County Children and Youth Services and requested that a caseworker be present during the execution of the warrant. (See Defs.' Statement of Mat. Facts at ¶ 21.)

Later that afternoon, Defendants, accompanied by members of the neighboring Beaver Meadows Police Department "BMPD"), gathered at the Park residence. (See Defs.' Statement of Mat. Facts at ¶ 27.) Defendants maintain that BMPD's officers were stationed at the rear of the Park residence, while the Defendants organized at the front door. (See id.) Defendants assert that, in compliance with the knock and announce rule, they knocked on the Parks' front door. (See Defs.' Statement of Mat. Facts at ¶ 22.) At that time, Defendants allege that a pane from an already broken window fell and broke. (See id.) Defendants Bogart and Markovchik, who were stationed at the front door, claim that Brandy

waved at them and indicated they could enter.[1]  (*See id.* at ¶23.)  Plaintiffs dispute this

version of events, as Brandy testified in her deposition that she only became aware of a

police presence after she heard glass breaking and witnessed several officers coming

through her front door. (*See* Brandy Lee Park Dep. Tr. at 56:17-21; 57:19-34; 59:3-17, ECF

Dkt. 81-3.)

Plaintiffs further insist that Defendants pointed their guns, including a shotgun, at

Brandy and her children, and that Brandy pleaded with Defendants to not be handcuffed in

front of her children. (*See id.* at 61-66.) Defendants contest this version of events and

argue that they never entered the home with a shotgun, that they kept all other firearms

holstered upon entry, and that guns were never pointed at Brandy or her children.[2] (*See*

Defs.' Statement of Mat. Facts at ¶¶ 24-25.)

Defendants state that they found the house in considerable disarray, and requested

the assistance of the Luzerne County Sheriff's Department's K-9 unit to facilitate a more

thorough search. (*See id.* at ¶ 32.) Although it took more than an hour for the K-9 unit to

respond, ultimately no drugs were found within the Park residence.  Nevertheless, two

---

[1] There is dispute as to whether exigent circumstances played a role in Defendants decision to enter.  Veasie testified at a preliminary hearing that Defendants Bogart and Markovchik may have entered the residence because they heard movement which could have been associated with an effort to destroy evidence.  Veasie, however, was stationed at the sidewalk and was not present at the front door.  Veasie later clarified his testimony to indicate that he thought exigent circumstances existed, but was later informed by Bogart and Markovchik that they were waived into the home by Brandy.  Defendants maintain that Veasie did not intend to provide misleading testimony, but Plaintiffs assert that this misrepresentation was an intentional lie.

[2] Defendants argue that after the premises was swept for dangers and secured by Bogart and Markovchik, Markovchik exited the building and was handed a shotgun by Veasie.  Defendants further assert that Markovchik then placed the shotgun in the locked trunk of a police cruiser before re-entering the residence.

additional contraband pipes were found in plain view and confiscated by Defendants.[3] (*See* Michael Bogart Dep. Tr. 229:6-12, ECF Dkt. 78-3.)

At some point during the search, Michael arrived home from work. Defendants testified that Michael became "emotional" and, given his physical stature, a decision was made to place him in flex-cuffs and have him remain on the front porch. (*See id.* at 34.) Plaintiffs maintain that Michael remained calm and obedient to police authority throughout the duration of the search, and that the flex-cuffs were unnecessary. (*See* Pls.' Statement of Mat. Facts at ¶¶ 49-54.)

Following the confiscation of two alleged marijuana pipes from the Park residence, Michael was subsequently placed under arrest for possession of drug paraphernalia. (*See* Michael Bogart Dep. Tr. 229:6-12.) Brandy was not charged. (*See* Pls.' Statement of Mat. Facts at ¶¶ 45-46.)

Veasie then ordered Kevin Kane ("Kane") of Children and Youth Services to take Joshua into protective custody. (*See* Kevin Kane Dep. Tr. 67:9-13, ECF Dkt. 60-10.) Defendants maintain that Veasie's decision to take Joshua out of the home, and place him with a foster family, was motivated by a concern for the child's immediate safety following a raid on his parents' home based upon information supplied by the child. (*See* Defs.' Statement of Mat. Facts at ¶ 40.)

---

[3] Plaintiffs maintain that the paraphernalia in question did not belong to them, but belonged to a cousin named Michelle Aquilante ("Aquilante"), who briefly lived at the Park home. Aquilante provided a signed statement in which she admitted purchasing the devices, and further indicating that the Parks explicitly banned her from having such contraband in their home. *See* Statement of Michelle Aquilante, ECF Dkt. 81-3.

7

The charges filed against Michael were ultimately withdrawn, as the District Attorney's Office decided to allocate prosecutorial resources to other matters. (See Cynthia Hatton Aff. at ¶ 4, ECF Dkt. 51-1.) The District Attorney's Office, however, provided the Affidavit of Assistant District Attorney Cynthia Hatton, Esq., asserting that the DA's Office's decision to withdraw the charges should not be construed as reflecting an inability to prosecute Michael for his alleged misconduct or as exoneration on the merits. (See id.)

Plaintiffs posit that they were targeted for this search because Michael had raised objections at a September 10, 2008, town council meeting concerning the inequitable enforcement of municipal laws and state motor vehicle regulations by Veasie and the Weatherly Police Department. (See Pls.' Statement of Mat. Facts at ¶¶ 1-6.) Michael was joined by another borough resident, Timothy Williams ("Williams"), in his insistence that Veasie enforced laws against some residents while turning a blind eye to the alleged infractions of others. (See id. at ¶ 2.) Plaintiffs believe that Veasie's decision to search their home was in retaliation for Michael's protected political speech. (See Pls.' Second Am. Compl. at ¶ 30, ECF Dkt. 26.)

## STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A district court

may grant a defendant's motion for summary judgment when the plaintiff fails to provide any genuine issue of material fact. *See* Rule 56(c); *see also Krouse v. Amer. Sterilizer Co.*, 126 F.3d 494, 500 n.2 (3d Cir. 1997). The moving party has the burden to establish before the district court that the non-moving party has failed to substantiate its claims with evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Country Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1061 (3d Cir. 1990). "The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial." *See Book v. Merski*, 2009 WL 890469, at *4 (W.D. Pa. Mar. 31, 2009)(citing *Matsushita Elec. Indus. Company v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989)("the non-movant must present affirmative evidence—more than a scintilla but less than a preponderance—which supports each element of his claim to defeat a properly presented motion for summary judgment.")). The non-moving party is then charged with providing evidence beyond the pleadings to show specific facts by affidavit or by information contained "in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim." *Book*, 2009 WL 890469, at *4 (citing *Celotex*, 477 U.S. at 322; *Country Floors*, 930 F.2d at 1061).

Material facts are those whose resolution will affect the outcome of the case under applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). Although the Court is required to resolve any doubts as to the

existence of material facts in favor of the non-moving party for summary judgment, Rule 56

"does not allow a party resisting the motion to rely merely upon bare assertions, conclusory

allegations or suspicions." *Firemen's Ins. Company of Newark, N.J. v. Du Fresne*, 676 F.2d

965, 969 (3d Cir. 1982). Summary judgment, therefore, is only precluded if a dispute about

a material fact is "genuine", *viz.*, if the evidence would permit a reasonable jury to return a

verdict in favor of the non-moving party. *See Anderson*, 477 U.S. at 247-249.

## DISCUSSION

Although Plaintiffs' Second Amended Complaint suffers from a substantial lack of

clarity, the Court has discerned the constituent causes of action underlying the present suit

and addresses each matter in turn.

### I.     Fourth Amendment Claims Against All Defendants

Plaintiffs argue that their Fourth Amendment rights were violated by Defendants not

only when Veasie questioned Joshua without parental consent, but when Defendants

executed the search warrant at their home. Plaintiffs believe that the search was

constitutionally improper because it was: (A) founded on Veasie's questioning of Michael's

seven year old son, Joshua; (B) premised upon alleged misrepresentations made by Veasie

in the Affidavit of Probable Cause used to procure the search warrant; (C) carried out in a

manner exhibiting excessive force with regard to both the use of weapons and the

handcuffing of Michael; (D) conducted in violation of established Knock and Announce

rules; and (E) resulted in the unlawful seizure of Joshua. Plaintiffs further maintain that the

Borough of Weatherly is liable for these violations under *Monell, infra*, and its progeny.

## A. Propriety of Veasie's Questioning of Joshua Park

Plaintiffs argue that Veasie was not permitted to question Joshua without first

obtaining parental consent. Although the Second Amended Complaint does not clearly

plead this as an independent cause of action, Plaintiffs' moving papers intimate that they

intended to treat it as such. Notwithstanding the procedural defect in Plaintiffs' Second

Amended Complaint, the Court will address the merits of this claim.

In *United States v. Hollingsworth*, 495 F.3d 795 (7th Cir. 2007), the Seventh Circuit

addressed the propriety of questioning a sixth grader in connection with her mother's

suspected possession of marijuana. The events giving rise to the charges filed in

*Hollingsworth* are substantially similar to the matter *sub judice* in that a young student

volunteered incriminating information to school officials, which led to the issuance of a

search warrant and the subsequent arrest of a parent. *See id.* at 799. In *Hollingsworth*, the

sixth grade student had a dismal attendance record and school officials attempted to

contact the parent. *See id.* at 798. When a meeting was finally arranged, the parent did not

show up as requested. *See id.* After several unsuccessful attempts to arrange another

parent teacher conference, the student told the principal that her mother was avoiding

telephone calls from the school. *See id.* The principal then informed the student that school

officials, including the truancy officer, Steve Denny, would seek to visit the parent at home if

she continued to avoid a meeting. *See id.* at 798-99. The student told the principal that

Officer Denny could not come to the home until her mother and her boyfriend had a chance

to get rid of their "stuff" and that there were materials in the home that her mother did not

want anyone to see. *See id.* The principal recounted this story to Officer Denny and he

contacted the school's social worker. *See id.* at 799. The social worker spoke with the

student and uncovered that the "stuff" previously mentioned to the principal was marijuana,

and that the student often saw it in her home. *See id.* The student further indicated that her

mother often went on drug runs with her boyfriend, that her mother smoked "blunts" in the

home, and that she sees marijuana in the house routinely. *See id.* The social worker

relayed her conversation with the student to Officer Denny who, in turn, relayed the contents

of that conversation to a member of the police drug task force. *See id.* Officer Denny

testified about his conversation with the principal and social worker before a state judge who

then issued a search warrant based on that testimony. *See id.*

In a motion to suppress evidence, the mother challenged the government's use of

the evidence obtained in the search. *See id.* The district court granted the mother's motion

to suppress, and noted that "police questioning of [the student] by school personnel without

her mother's knowledge, while she was removed from class during school hours all for the

sole purpose of incriminating her mother, amount[ed] to the kind of governmental abuse of

power that 'shocks the conscience.'" *See id.* The government appealed, and the Seventh

Circuit reversed, finding that the school officials' treatment of the student was

constitutionally permissible. The Court opined:

> In this case, the government's interest in speaking with [the student] was
> compelling because it had at least some reason to believe that [the parent]
> was engaged in illegal activity. *See United States v. Amerson*, 483 F.3d 73,
> 87 (2d Cir. 2007)("There can be little doubt that the government has a
> compelling interest in rapidly and accurately solving crimes. . . ."); *Johnson v.
> City of Cincinnati*, 310 F.3d 484, 502-03 (6th Cir. 2002). "[The truancy officer]
> knew that [the student] was repeatedly late to school, that [the mother]
> refused to speak with school officials about the problem, that she did not want
> [the truancy officer] coming to the home before she could remove her "stuff,"
> and that she had left her nine-year-old child alone at home on a number of
> occasions. Though this information, by itself, was not enough to establish
> probable cause, the statement was suspicious and suggested—at least to
> some degree—that [the parent] was exposing her child to drugs.

*Hollingsworth*, 495 F.3d at 802. Further, the court observed that:

> [p]rotecting children from parental abuse may be more pressing than drug
> crimes, but a short interview by school officials is a minimal deprivation that
> requires little justification when it comes to avoiding a substantive due
> process violation.   [The counselor's] interview was not "without any
> reasonable justification in the service of a legitimate governmental objective."

*Id.* at 803 (internal citations omitted).

Similarly, in *United States v. Penn*, 647 F.2d 876 (9th Cir. 1980), the Ninth Circuit

held a police officer's five dollar bribe of the defendant's five-year-old son in order to extract

incriminating information was not unconstitutional.  In coming to its decision, the court noted

that the bribe did not violate the "fundamental fairness" component of the Due Process

Clause, and that the officer had a right to speak with the child because the mother was

suspected of harboring illegal substances on the premises.

13

In contrast, in *Grendell v. Gillway*, 974 F. Supp. 46 (D. Me. 1997), which involved the Fifth Amendment, the District of Maine found that a police officer's threats to an eleven-year-old girl that if she did not provide certain incriminating details about her parent's drug use that both she and her parents would be subject to punishment, and even prison, as "shocking to the conscience" and in violation of the child's substantive due process. The circumstances in *Grendell* are particularly egregious because the student was told that her parents would be imprisoned absent her immediate cooperation, and that the young girl should not tell her parents about talking to the authorities because "often parents beat their children after the children talk to police." *Id.* at 49.

In the present matter, a second grader was found in possession of a marijuana pipe. School officials, and then the police, reasonably questioned the student who then unwittingly incriminated his parents and provided specific information about additional contraband within the Park residence. The record does not indicate that Joshua was threatened, bribed, or coerced into providing this information. Most importantly, Joshua not only provided officers with incriminating information about his parents' use of marijuana, but he had contraband material, i.e., a marijuana pipe, in his physical possession. Accordingly, the Court finds that it was not unreasonable for Veasie to question a second grade student as to why and how he was in possession of a marijuana pipe, and such conduct does not violate the Due Process rights of any Plaintiff in this matter. The government's interest in enforcing the law prohibiting unlawful drug use, together with the compelling need to

14

prevent children from being exposed to unlawful drug use by their parents, outweighs any claim that parental consent must be had before a child, like Joshua, is questioned under the circumstances of this case.

### B. Alleged Misrepresentations in Affidavit of Probable Cause

Plaintiffs allege that the search warrant issued in connection with Joshua's statements to Veasie was unprecedented, that the Affidavit of Probable Cause contained false sworn statements by Veasie, and that the search was improper because children were present in the home. Plaintiffs do not, however, show the materiality of the alleged misstatement, nor do Plaintiffs indicate the relevance of their other contentions.

First, Plaintiffs' papers indicate that there are multiple inconsistencies with regard to facts contained in the Affidavit of Probable Cause used to secure the search warrant. Plaintiffs fail to provide an evidentiary basis for their assertion that there are multiple errors, rather than just one concerning an alleged typographical error. The Affidavit signed by Veasie contains the following language:

> It was reported to this affiant that JOSHUA PARKS (sic) had brought a multi-color glass bowl used for smoking marijuana to school. The bowl had marijuana residue in it. I spoke with JOSHUA PARKS (sic) in the presence of the school principal and he stated that his parents smoke from **the bowl**. He stated that they crush ashes and then put them **in the bowl** and smoke from it.

See Affidavit of Probable Cause, ECF Dkt. 51-1 (emphasis added).

Although Veasie testified in a deposition that Joshua "absolutely didn't say that his parents smoked" out of the specific pipe Joshua brought to class, Plaintiffs argue that the

Affidavit "absolutely" indicates that this was the case. (*See* Pls.' Br. in Supp. Mot. Summ. J. at 22, ECF Dkt. 39.) Veasie admits that Joshua never told him that his parents smoke from the bowl he brought to school, but he did indicate that his parents smoked from "bowls."

For the purpose of deciding the present motions, the Court will assume that Veasie improperly attributed Joshua's statements regarding bowls in general to the specific bowl he brought to school, and upon realizing the error, failed to attempt any corrective effort. Even under those circumstances, Plaintiffs fail to articulate any reason as to why the warrant was either defective or facially deficient. Plaintiffs point to no evidence in the record to indicate that Veasie intentionally misled the judge who issued the search warrant, and nothing indicates that the judge issued the warrant purely on the basis of Joshua's reference to his father smoking from a particular bowl. It is readily apparent that the Court found probable cause to search the Park residence based on the fact that Plaintiffs' second grade son brought a marijuana pipe to school and then proceeded to inform authorities that his parents smoke from either that bowl or ones of a similar nature. The Affidavit indicates that the child even knew some rudimentary features of a marijuana pipe's design when he told school officials that his parents "crushed ashes" and lit it. (*See* Affidavit of Probable Cause, ECF Dkt. 51-1; Sandra Slavick Aff. at ¶ 12.) Plaintiffs draw a distinction which does not affect the validity of the warrant. There was a sufficient factual basis for the warrant's issuance whether Veasie indicated that Joshua was referring to the bowl he brought to school or to similar objects within his house.

Plaintiffs additional arguments that Veasie had only participated in the service of one other search warrant, and that there were children expected in the home at the time of the search, are of no relevance with regard to the warrant's validity or the reasonableness of its execution.

## C. Excessive Force

Plaintiffs maintain that Defendants used excessive force in their service of the warrant because they pointed weapons, including a shotgun, at Brandy and her children, and because Michael was unnecessarily restrained with flex-cuffs on his front porch. Both arguments are unavailing.

For the purpose of deciding these motions, the Court assumes that the officers entered the Park residence with guns drawn and pointed at Brandy and her children. The Court will further assume for the sake of argument that a shotgun was brought into the home by police officers.

Excessive force claims under the Fourth Amendment are analyzed under a reasonableness standard. *Brower v. County of Unyo*, 489 U.S. 593, 596 (1989); *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141 (3d Cir. 2005).

> In deciding whether challenged conduct constitutes excessive force, a court must determine the objective reasonableness of the challenged conduct, considering the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. Other factors include the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must

> contend at one time. . . .Thus, the court should not apply the 20/20 vision of hindsight, but should instead consider the perspective of a reasonable officer at the scene.

*Couden v. Duffy*, 446 F.3d 483, 496-97 (3d Cir. 2006)(internal citations and quotation marks

omitted). The absence of physical injury or contact does not necessarily mean that

excessive force was not used. *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).

In the present matter, police officers were executing a search warrant to look for

drugs and drug paraphernalia. As the Third Circuit explained in *Torres v. United States*,

200 F.3d 179 (1999):

> The Supreme Court has held that officers executing a search warrant may lawfully restrain persons present at the searched premises." *See Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981)("[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.") (footnotes omitted). In *Summers*, the Supreme Court noted that the warrant to search for narcotics "may give rise to sudden violence or frantic efforts to conceal or destroy evidence," and thus the risk of harm to officers and occupants alike "is minimized if the officers routinely exercise unquestioned command of the situation." *Id.* at 702-03, 101 S.Ct. at 2594. The Supreme Court indicated that the officers might exceed their proper authority in an "unusual case" involving "special circumstances, or possibly a prolonged detention," but the "routine" detention of residents while a search is conducted is constitutional. *Id.* at 705 n. 21, 101 S.Ct. 2595 n. 21.

*Torres*, 200 F.3d at 185. In *Muehler v. Mena*, 544 U.S. 93 (2005), the Supreme Court

reaffirmed its holding in *Michigan* that "officers executing a search warrant for contraband

have the authority 'to detain the occupants of the premises while a proper search is

conducted.'" *Id.* at 97 (citing *Michigan*, 452 U.S. at 705. The Supreme Court further noted:

> Such detentions are appropriate, we explained, because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial. We made clear that the detention of an occupant is "surely less intrusive than the search itself," and the presence of a warrant assures that a neutral magistrate has determined that probable cause exists to search the home. Against this incremental intrusion, we posited three legitimate law enforcement interests that provide substantial justification for detaining an occupant: "preventing flight in the event that incriminating evidence is found"; "minimizing the risk of harm to the officers"; and facilitating "the orderly completion of the search," as detainees' "self-interest may induce them to open locked doors or locked containers to avoid the use of force."

*Muehler*, 544 U.S. at 98 (internal citations omitted).

While police officers are not given unfettered discretion in the execution of narcotics search warrants, under the circumstances presented in this case, they are certainly permitted to enter the unknown premises prepared to respond to possible violence.

In *Woodlen v. Jimenez*, 173 F. App'x 168 (3d Cir. 2006), the Third Circuit added that the "use of handcuffs and other physical restraints does not necessarily transform an investigatory seizure into a formal arrest requiring probable cause." *Id.* at 170. Furthermore, "the use of restraint must be reasonable under the totality of the circumstances." *Id.* (citing *Torres*, 200 F.3d at 185-86). When Michael arrived home to find his residence the subject of a search warrant, it was not objectively unreasonable for police officers to place him in handcuffs after he became "emotional." Although the undisputed facts present a close call, and the definition of "emotional" is fluid, the dispositive considerations for this Court include the fact that the raid was effectuated for drug offenses, the fact that Michael became "emotional" in some manner, and the fact that reasonable

police officers could determine that a person's physical stature heightens the possibility of violence.

Moreover, even if the use of hand restraints on Michael was constitutionally impermissible, the officers would be entitled to qualified immunity because placing a person in custody under the undisputed circumstances in this case does not violate any clearly established right. While the police are not entitled to physically restrain a person merely because his home is the subject of a search, the police are entitled to use restraints if the overall circumstances warrant such an action. Under the specific circumstances established in this case, the officers did act in violation of any "clearly established right."

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity serves the dual purpose of holding government officials accountable when their power is exercised unreasonably and protecting those officials from "harassment, distraction, and liability when they perform their duties reasonably." See id. "Qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Id. (citing Groh v. Ramirez, 540 U.S. 551, 567, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (Kennedy, J., dissenting)).

Qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)(emphasis deleted). The qualified immunity doctrine serves to eliminate "insubstantial claims" prior to discovery. Pearson, 555 U.S. at 231 (citing Anderson v. Creighton, 483 U.S. 635, 640 n. 2, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stages in litigation." Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam).

In Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court articulated a two-step test to determine the appropriate application of qualified immunity. A court must decide: (1) whether the facts alleged by the plaintiff violate a constitutional right; and (2) if so, whether that right was "clearly established" at the time of the alleged violation. Id. at 201. Qualified immunity attaches unless the official's conduct violated such a clearly established right. Anderson, 483 U.S. at 640. However, the Saucier procedure, which erected a rigid framework, no longer mandates that district courts decide the two prongs in any particular order. Pearson, 555 U.S. at 236. The decision is left to the discretion of the district court. Id.

While the question of the propriety of the use of handcuffs presents a close call to this Court, even if the use of zip-cuffs was unconstitutional, the application of qualified immunity would clearly be warranted because the circumstances do not present events that

give rise to a violation of any "clearly established" right. As the Third Circuit held in *Woodlen*, *supra*, which involved an "investigatory stop," even if we assume that Michael's conduct was "not sufficient to justify the use of handcuffs and confinement . . . we cannot conclude that the right to be free from physical restraint under these circumstances was clearly established." *Id.* at 171. The Court in *Woodlen* did not resolve the factual dispute concerning the interpretation of a handcuffed suspect's behavior during an investigatory stop or determine that his actions were "threatening" after he yelled and angrily questioned police, but the court noted that the suspect did yell at the officers in an angry tone. *Id.* Similarly, in the present matter, Michael became "emotional" and officers decided that zip-cuffs were necessary to ensure the safety and order of the search scene. Reasonable police officers acting under identical circumstances could perceive Michael's behavior as requiring hand restraints. Therefore, summary judgment in favor of Defendants on this claim will be granted.

## D. Knock and Announce Rule

During the service of a search warrant, police officers must knock and announce their identity and purpose, and give the persons inside the premises an opportunity to open the door. *See Com. v. Carlton*, 549 Pa. 174, 181 (1997); *see also* Pa. R. Crim. P. 207(A). The knock and announce rule is premised upon the notion that by allowing inhabitants of a particular building to open a door, the possibility of violence and property damage is diminished. *See id.* at 182. These purposes are only effectuated when law enforcement

authorities allow a "reasonable" period of time before forcing entry following their announcement of identity, authority, and purpose. *Id.*

In the present matter, Plaintiffs allege that the police failed to adhere to the knock and announce rule, and that Brandy was only alerted to the arrival of the police officers following the sound of broken glass. Brandy alleges that she then saw police officers coming through her front door brandishing guns. Defendants argue that they knocked and announced their presence. Officers Bogart and Markovchik insist that they entered only after Brandy waved to them and intimated that they could come into the dwelling. As detailed earlier in this memorandum, Veasie provided two separate, but not necessarily inconsistent, versions of events. What is clear, however, is that Plaintiffs and Defendants offer substantially different accounts of the events that transpired, and this gives rise to a disagreement regarding a material issue of fact. Accordingly, summary judgment is inappropriate with regard to this claim against all Defendants.

## E. Placement of Joshua Park Into Protective Custody

Plaintiffs maintain that Joshua was wrongfully removed from their home by Veasie and that his actions violated the "oldest of the fundamental liberty interests recognized." *See Pls.' Br. in Supp. Mot. Summ. J.* at 51, ECF Dkt. 39 (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Third Circuit recognizes that parents have "constitutionally protected liberty interests" in the custody, decision making, and care of their children. *See Croft v. Westmorland County Children and Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997).

Plaintiffs argue that Defendants violated this right in two ways: (1) when Veasie questioned Joshua at the school, and (2) when Veasie ordered Joshua's removal from the home at the time of the search.

This Court has already established that Veasie acted properly with regard to the questioning of Joshua at his elementary school, but the Court is troubled by his removal from the Park home at the time of the execution of the search warrant. Pennsylvania statute governs the extraordinary circumstances in which a child may be taken into protective custody:

> A child may be taken into custody . . . by a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child is suffering from illness or injury or is in imminent danger from his surroundings, and that his removal is necessary.

42 Pa.C.S. § 6324(3).

As the Third Circuit noted in *Croft, supra*, "a state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Croft*, 103 F.3d at 1126. Law enforcement authorities were required to have "objectively reasonable grounds" to support that Joshua was in "imminent danger" before he could be taken from his parents and placed with a foster family. "Absent reasonable grounds, government intrusions of this type are arbitrary abuses of power." *Id.*

The record presented in the instant case appears far less compelling than the facts set-forth in *Croft*, where authorities removed a child whose parents were accused of sexual

abuse; however, the removal in *Croft* was based upon "six-fold hearsay" that resulted in an anonymous, vague tip. *Id.* Veasie believed that Joshua was in imminent danger, but the record does not contain any objective basis to support this contention, leaving only Veasie's apparent subjective belief. Accordingly, the reasonableness of Joshua's removal is a disputed issue of material fact, and summary judgment cannot be granted on this count.

## II.   First Amendment Retaliation Claim

In order to prevail on a First Amendment retaliation claim, a plaintiff must establish that: (1) he engaged in a constitutionally protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation. *See Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004); *Herman v. Carbon County*, 248 F. App'x 442, 444 (3d Cir. 2007); *Gallis v. Borough of Dickson City*, No. 05-551, 2006 WL 2850633, *4 (M.D. Pa. Oct. 3, 2006). "A defendant can rebut a prima facie case of retaliation by showing that 'the same adverse action would have taken place in the absence of the protected conduct.'" *Conklin v. Warrington Twp.*, No. 05-1707, 2007 WL 4248214, * 3 (M.D. Pa. Nov. 30, 2007)(citing *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001)).

In the present matter, Plaintiffs argue that Michael's public criticisms of Veasie and the Weatherly Police Department at a municipal council meeting caused Veasie to retaliate by questioning Joshua, obtaining a search warrant under false pretenses, and executing the warrant in an illicit manner and with excessive force. Plaintiffs also assert that the decision

to place Joshua into custody and arrest Michael without filing charges against Brandy was further animated by a desire to punish Michael for his protected speech. Plaintiffs point to the fact that Michael spoke out against Veasie and the Weatherly Police Department on November 10, 2008, and that the actions underlying this suit occurred only eight days later.

"To establish the causation element of a retaliation claim, a plaintiff must prove that the exercise of his First Amendment rights 'placed some substantial role' in motivating the adverse action." *Conklin*, 2007 WL 4248214, at *3. "The temporal proximity of an adverse action to a plaintiff's exercise of his First Amendment rights is probative of the causation element of a retaliation claim." *Id.* (citing *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003)). Here, Michael's protected speech was articulated a mere eight days before the alleged adverse actions; however, the questioning of Joshua, the issuance of a search warrant, and the search of the Park residence would have occurred regardless of any alleged retaliatory motive. With regard, however, to Joshua's placement into protective custody, and to the arrest of Michael without arresting Brandy, Plaintiffs raise a genuine issue of fact as to whether retaliation was the motive behind Defendants' actions. The record does not present any undisputed issue of material fact that an independent basis existed warranting the placement of Joshua into protective custody or explaining why Michael was selectively arrested for possession of paraphernalia while Brandy was never arrested or charged. Accordingly, summary judgment will be granted in favor of Defendants on Michael's First Amendment claim on the existence of retaliation by the issuance of a

search warrant for the Park's residence, but not as to Michael's claim of retaliation with

regard to the placement of his son, Joshua, into protective custody at the time of the service

of the warrant, and not with regard to Michael's claim that he alone was selected for arrest

and prosecution for retaliatory reasons.

## III.    Monell Liability Against the Borough of Weatherly

The case governing municipal liability under Section 1983 is Monell v. Dept. of Soc.

Servs., 436 U.S. 658 (1978). Under Monell, for cases brought under 42 U.S.C. § 1983, the

plaintiff must demonstrate the existence of some policy or custom of the defendant's

causing an alleged constitutional tort. The Third Circuit has explained as follows:

> In determining whether a government entity may be held liable under 42
> U.S.C. § 1983 we are guided by the rule, announced in Monell v. New York
> City Department of Social Services, that liability may not be proven under the
> respondeat superior doctrine, but must be founded upon evidence that the
> government unity itself supported a violation of constitutional rights.  Thus,
> municipal liability attaches only when "execution of a government's policy or
> custom, whether made by its lawmakers or by those whose edicts or acts
> may fairly be said to represent official policy, inflicts the injury."

Bielevicz v. Dubinon, 915 F.2d 845, 849-50 (3d Cir. 1990). A "policy" exists "when a

'decision maker possess[ing] final authority to establish municipal policy with respect to the

action' issues an official proclamation, policy, or edict.'" Watson v. Abington Twp., 478 F.3d

144, 155 (3d Cir. 2007). A custom may be established, on the other hand, "by showing that

a given course of conduct, although not specifically endorsed or authorized by law, is so

well-settled and permanent as virtually to constitute law." See id. at 155-56 (citing Andrews

v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)). "In other words, custom may

be established by proving knowledge of, and acquiescence to, a practice." Id. (citing

Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir. 1989)).

The undisputed facts contained in the record fail to exonerate Defendant Borough of

Weatherly for the alleged improprieties of its police officers, as the record is unclear as to

whether Veasie was a policy maker for the purposes of Monell. Deposition testimony from

now-Chief Brian Markovchik indicates, but does not conclusively show, that the police chief

is vested with broad policy making powers. (See Brian Markovchik Dep. Tr. 11:11-14, ECF.

Dkt. 60-9). Veasie's deposition testimony reveals that Veasie shared a similar

understanding of the police chief's ability to make policy. (See Gary Veasie Dep. Tr. at

54:6-25, ECF Dkt. 60-3.) An affidavit submitted by Weatherly's Borough Manager, Harold

Pudliner ("Pudliner"), however, indicates that the police chief is not vested with any policy

making power. (See Harold Pudliner Aff. at ¶ 21, ECF Dkt. 51.) Nevertheless, although the

chief may not have a formal role in the implementation or finalization of policy, the record

demonstrates that the police chief may have broad discretion in the day-to-day operations of

his department. Such discretion indicates that Monell liability may exist with regard to

Plaintiffs' Fourth Amendment claims.

Finally, Defendants' assertion that the search team executed the warrant in question

"under the umbrella of the Pennsylvania Attorney General's Drug Task Force and was not a

Weatherly Borough Police undertaking" is unavailing. (See Defs.' Br. in Supp. Mot. Summ.

J. at 44, ECF Dkt. 49.) Nothing in the record demonstrates that authorities from the

Pennsylvania Attorney General's Office supervised the execution of the search warrant, or were even present at the time of the warrant's service. Accordingly, based on the facts contained in the record, summary judgment in favor of either party with regard to Plaintiffs' *Monell* claims is inappropriate.

## IV.   State Law Claims

Plaintiffs' Second Amended Complaint sets forth three state law causes of action including: (1) intentional infliction of emotional distress; (2) unlawful imprisonment; and (3) false light invasion of privacy. For the reasons set forth below, summary judgment will be granted in favor of Defendants on all three of these claims.

### A. Intentional Infliction of Emotional Distress

For Plaintiffs to prevail on a claim for intentional infliction of emotional distress, they must show that Defendants acted with "intentional, outrageous or extreme conduct" which caused them severe emotional distress. *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005). "Outrageous or extreme conduct has been defined by the appellate courts of this Commonwealth as conduct that is so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." *Id.* (internal quotation marks omitted). "With regard to the element of outrageousness, it is for the court to determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery." *Id.* at 1231.

> Cases which have found a sufficient basis for a cause of action of intentional infliction of emotional distress have . . . presented only the most egregious conduct.   *See*[,] *e.g.*, *Papieves v. Lawrence*, 263 A.2d 118 (Pa. 1970)(defendant, after striking and killing plaintiff's son with automobile, and after failing to notify authorities or seek medical assistance, buried body in a field where discovered two months later and returned to parents (recognizing but not adopting section 46)); *Banyas v. Lower Bucks Hospital*, 437 A.2d 1236 (Pa. Super. Ct. 1981)(defendants intentionally fabricated records to suggest that plaintiff had killed a third party which led to plaintiff being indicted for homicide); *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979)(defendant's team physician released to press information that plaintiff was suffering from fatal disease, when physician knew such information was false).

*Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998).  Furthermore, a plaintiff must demonstrate physical injury or harm to sustain a cause of action for intentional infliction of emotional distress.  *Fewell v. Besner*, 664 A.2d 577, 582 (Pa. Super. Ct. 1995)(citing *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 995 (Pa. 1987)("Those truly damaged should have little difficulty in procuring reliable testimony as to the nature and extent of their injuries. . . . [A]t the very least, existence of the alleged emotional distress must be supported by competent medical evidence.")); *Crivellaro v. Pennsylvania Power and Light Co.*, 419 A.2d 207 (Pa. Super. Ct. 1985)(finding that symptoms of depression, nightmares, anxiety requiring psychological treatment, and . . . ongoing mental, physical and emotional harm sufficiently stated physical manifestations of emotional suffering to sustain a cause of action).

Here, Plaintiffs provide no medical evidence of a physical injury, nor do they provide any competent evidence supporting the propriety of their claim.  In Plaintiffs' Brief in

Opposition to Defendants' Motion for Summary Judgment, Plaintiffs offer nothing to rebut Defendants argument that their intentional infliction of emotional distress claim is unsupported by any evidence, and that the Defendants actions were not indicative of the elements of this tort. This Court's holding that the questioning of Joshua, and the subsequent execution of a warrant at Plaintiffs' residence, was constitutionally valid further undermines Plaintiffs' claim for intentional infliction of emotional distress. Nothing in the record shows that any action taken by Defendants was so outrageous so as to shock the conscience, nor were Defendants' alleged actions beyond all possible bounds of decency so as to be regarded as atrocious. In fact, many of the undisputed material facts show otherwise. Therefore, summary judgment will be granted in favor of Defendants with regard to Plaintiffs claims for intentional infliction of emotional distress.

### B. False Imprisonment

To sustain a claim for false imprisonment, a plaintiff must show that (1) there was a detention of another person, and (2) that such a detention was unlawful. *See Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994). "To establish liability for false imprisonment, the plaintiff has the burden to provide that (1) Defendant acted with the intent to confine Plaintiff within boundaries fixed by him; (2) Defendant's act directly or indirectly resulted in such confinement; and (3) Plaintiff was conscious of this confinement or was harmed by it." *Pennoyer v. Marriott Hotel Servs., Inc.*, 324 F. Supp. 2d 614, 619-20 (E.D. Pa. 2004)(citing *Gagliardi v. Lynn*, 285 A.2d 109, 111 n.2 (Pa. 1971)). "Confinement may be effected by

31

physical barriers or physical force, by submission to a threat to apply physical force, or by taking a person into custody under an asserted legal authority." *Id.* (citing *Chicarelli v. Plymouth Garden Apartments*, 551 F. Supp. 532, 541 (E.D. Pa. 1982)). "Additionally, Plaintiff must make some request to leave, which request is denied by the defendant." *Id.*

In the present matter, the record indicates that Michael Park and his family were confined to different parts of their home during the execution of a lawfully issued search warrant. Third Circuit case law is unambiguous with regard to the right of law enforcement to detain persons present during the service of a search warrant. *See Torres v. United States*, 200 F.3d 179, 185 (3d Cir. 1999)(citing *Michigan v. Summers*, 452 U.S. 692, 705 (1981)("[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.")). Furthermore, the record does not show that Michael ever requested to be released from his lawful confines. Accordingly, Plaintiffs' claim for false imprisonment must fail and summary judgment will be granted in favor of Defendants.

## C. False Light Invasion of Privacy

In order for a claim of false light invasion of privacy to be successful, the plaintiff "must show that a highly offensive false statement was publicized by [defendants] with knowledge or in reckless disregard of the falsity." *Santillo v. Reedel*, 634 A.2d 264, 266 (Pa. Super. Ct. 1993)(citing *Neish v. Beaver Newspapers, Inc.*, 581 A.2d 619, 624 (Pa. Super. Ct. 1990), *alloc. denied*, 593 A.2d 421 (Pa. 1991)). The record indicates that

32

Plaintiffs have not supplied any factual support to buttress their claim. In fact, Plaintiffs'

Brief in Opposition to Defendants' Motion for Summary Judgment offers no argument in

favor of their claim whatsoever. Plaintiffs' complete opposition is recounted here: "With a

similar obliviousness of the record, defendants contend that Mr. Park's arrest cannot be the

basis for a claim of false light invasion of privacy because it is a matter of 'public record and

concern.' They ignore, of course, Mr. Park's humiliating detention on his front porch, and

the fact that the raid itself should never have occurred in the first place!" (Pls.' Br. in Opp.

Defs.' Mot. Summ. J. at 69, ECF Dkt. 60.) Plaintiffs fail to articulate any evidentiary basis

for their claims, except to say that the police unlawfully detained Michael on his front porch

and that the police were not entitled to search the premises in the first place. Given the

Court's holding that the search was proper, and that the police have the ability to detain a

person found at the scene targeted by a search warrant, Plaintiffs' claim for false light

invasion of privacy must fail. Summary judgment, therefore, is proper in favor of

Defendants on this count.

## CONCLUSION

For the reasons set forth in this memorandum, Plaintiffs' Motion for Partial Summary

Judgment will be Denied.  For these same reasons, Defendants' Motion for Summary

Judgment will be Granted in Part and Denied in Part.  A separate Order follows.

DATE: April 20, 2012

Robert D. Mariani
United States District Judge